CLINTON GAS LIGHT COMPANY vs. EBEN S. FULLER
& another.

Worcester.   October 7, 1897. — January 6, 1898.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & MORTON, JJ.

*Maintenance of Dam — Deed — Right of Flowage — Abandonment — Non-user
— Change in Channel — Equity.*

In 1823, A. conveyed to B. a mill site and water privilege "with the privilege of
following up the ditch to the bounds of" certain land.  The "ditch" was a
natural watercourse flowing within a defined channel.  From 1823 to 1876 there
were a mill and dam maintained on the original site by its successive owners,
and standing on and across the watercourse.  In 1848, a railroad corporation
constructed its road-bed over the watercourse, and built its culvert in such a
way as to change the channel, which was acquiesced in by all parties.  The
new channel continued to be used until 1876, when a washout caused by the
breaking of another dam carried away the mill and dam in question, and no
other has been built on the site; and this washout caused another change in the
channel, which was also acquiesced in by all parties.  The owner of the mill
and dam at the time of the washout brought suit against the owner of the dam
which broke, and recovered judgment, which was satisfied.  In 1895, C., who
acquired his title by mesne conveyances from B., built a dam across the water-
course several hundred feet distant from the original dam, which did not raise
the water to a higher level than that did, but set back the water upon land
of D., bordering on the watercourse, who claimed under mesne conveyances from
A., to his injury.  *Held*, that D. could not maintain a suit in equity against C.
to restrain the maintenance of his dam.

BILL IN EQUITY, filed February 29, 1896, in the Superior
Court, to restrain the defendants from maintaining a dam and
obstructing a watercourse, and causing it to flow back upon the
plaintiff's land.

The case was referred to a master, who found and reported
the following facts, among others.

The plaintiff is a corporation, having its usual place of business
at Clinton, and has a title by deed to the land described in the bill.
The defendants have a title by deed to certain lands and a water
privilege situated easterly of the plaintiff's land, upon which
they have erected and maintain the dam complained of.  From
time immemorial there has existed a natural watercourse, taking
its rise westerly of the plaintiff's land, flowing by the same over

and through other estates and thence over and through the lands of the defendants in an easterly direction.

In 1823, John Low, being the owner of the lands now owned by the plaintiff and the defendants, the land intervening between the same, and also the land on both sides of the natural watercourse for some distance westerly of the plaintiff's land, conveyed to Henry Low the mill site and water privilege now owned by the defendants, the descriptive part of the conveyance containing the following: " A mill site and water privilege in the south part of said Lancaster, near the dwelling-house of the said John Low, containing about half an acre of land, more or less, it being the land whereon the said Henry has erected a workshop and erected a dam and flowed a pond of water containing all the ground whereon the shop stands and the land covered with water by raising said dam, with the privilege of following up the ditch to the bounds of land owned by Samuel Plant."

In 1823, Clinton was a part of Lancaster.

In 1885, James S. Lawrence conveyed to the defendant Eben S. Fuller a piece of land situated on the watercourse easterly of the plaintiff's land, westerly on the before described mill privilege, and between the Worcester and Nashua Railroad and Main Street.

By mesne conveyances, the defendants, in February, 1895, acquired the mill privilege, the descriptive clause in the deed thereof containing the following: " A certain lot or parcel of land situate east of Main Street in said Clinton, with all the water privileges belonging thereto."

On July 5, 1890, Louis G. Beck, claiming through mesne conveyances from John Low, conveyed to the plaintiff a tract of land upon which its manufactory is situated.

In June, 1891, the Clinton Wire Cloth Company, owning land adjoining and southerly of the before described land of the plaintiff, and the plaintiff, by deed of release and quitclaim dated May 27, 1891, executed mutual releases of certain triangular pieces of land, for the purpose of establishing a new boundary line between their estates.

At the time of the execution of the release and quitclaim the Clinton Wire Cloth Company and the plaintiff executed an in-

denture by which the Clinton Wire Cloth Company granted to the plaintiff " the right to divert the brook which runs through the lot of land now owned by said Clinton Wire Cloth Company, between Parker Street and the location of the Boston and Maine Railroad in Clinton, from its present channel at any point within fifty feet of the location of said railroad, and conduct it to the boundary line between the land of the " plaintiff and the land of the Clinton Wire Cloth Company as established by the releases above mentioned, " and thence conduct the same along said boundary line to said railroad, so that the centre line of said brook shall, as nearly as possible, coincide with said boundary line "; and the plaintiff covenanted " to bear the entire expense of the change in the course of said brook," and that the Clinton Wire Cloth Company and its successors " may consume and pollute the waters of said brook in any manner and extent which it or they shall deem necessary for the reasonable use thereof."

In June, 1886, John D. Brigham, being the owner through mesne conveyances from John Low, of a tract of land on the natural watercourse, embracing within its boundaries the triangular piece of land conveyed by the Clinton Wire Cloth Company to the plaintiff, conveyed said tract to David A. Draper, and in the conveyance, at the close of the descriptive clause, occurs the following language: " subject to any existing rights of flowage." On August 10, 1886, Draper conveyed the last before described tract of land to the Clinton Wire Cloth Company, using at the close of the descriptive clause the same language as in the deed to him from Brigham, to wit: " subject to any existing rights of flowage."

From 1823 down to 1876, there were a mill and dam maintained on the original site existing in 1823 by its successive owners, and standing on and across the natural watercourse at a distance of about 350 feet easterly of the present location of the Boston and Maine Railroad, " formerly the Worcester and Nashua Railroad." This mill and dam are the same referred to and described in the deed of John Low to Henry Low, and in subsequent deeds thereof. The " ditch " referred to in the deed of John Low and deeds of subsequent grantors was and is the natural watercourse flowing through the several estates hereinbefore described. At the time of the deed of John

Low, in 1823, this ditch was a natural watercourse, flowing within a defined and distinct channel or bed. The Samuel Plant land referred to in the deeds is located some five or six hundred feet up the stream, and westerly of the plaintiff's land. The original dam created a pond of water, as shown on a certain plan, and also a pond of water situated between the Worcester and Nashua Railroad, now the Boston and Maine Railroad, and the highway as shown on said plan. The ditch referred to in the deed of 1823 was westerly of the easterly line of the location of the railroad. In 1847 or 1848, the Worcester and Nashua Railroad constructed its road-bed over and across the natural watercourse, and westerly of the limits of the pond as then existing. In constructing this road-bed the railroad company built a culvert for a conduit for such watercourse ; but instead of building the culvert over the then location of the watercourse, built it some forty or fifty feet further north, so that after the construction of the road-bed the water ceased to flow in its old channel immediately westerly of the railroad and entered the pond situated between the railroad and Main Street in a new channel farther north. There is no evidence that this change in the location of the watercourse was assented to or objected to by the parties having rights in the watercourse, except what may be inferred by their silence. On March 26, 1876, a dam controlled by the Bigelow Carpet Company, situated westerly of all the before described premises and near the source of the watercourse, broke and gave way, causing a flood of water to pour down through and along the watercourse to the river below the premises of the defendants. This flood washed out the railroad bed and Main Street, and carried away the dam and mill situated on what are now the defendants' premises, leaving nothing remaining of the dam, pond of water, or mill. No dam or mill has been built on the site of the old dam and mill since the washout, and from March 26, 1876, to the present time the natural watercourse has flowed past the site of the old mill unutilized as a mill privilege by the owners of the same. This flood and washout caused a change in the channel of the natural watercourse existing prior to the washout between the railroad and a point indicated as Marshall Street on the above mentioned plan, so that thereafter to the present time the water

ceased to flow in the old channel and flowed in a new channel, varying from zero, at the point of departure, to fifty feet farther north. This change in the channel was acquiesced in by the owners of the servient and dominant estates, no attempt being made to restore the watercourse to its old channel, and no objection being made to the existence and use of the new channel. The railroad company immediately reconstructed its road-bed on the old location, but in doing so built the culvert for the passage of the watercourse at a point farther north than the old culvert, so that thereafter to the present time the water has entered the area between the railroad and Main Street at a point some distance north of the former point of entrance. There is no evidence that this change in the location of the culvert was assented to or objected to by the parties having rights in the water privilege, except what may be inferred by their silence. The channel of this watercourse was not changed by this washout east of Main Street. From the time of the washout, in 1876, to the time of the conveyance by Charles Frazer, the grantor of the defendants, to them in 1895, he made no use of the watercourse and mill privilege. The southern boundary of the plaintiff's original tract of land did not extend to the watercourse in its new channel. The release and quitclaim of the Clinton Wire Cloth Company to the plaintiff of the triangular piece of land southerly of its original purchase, by deed dated May 27, 1891, brought the plaintiff's title nearer to the watercourse in its new channel, but did not touch the same except at a point at the southeasterly corner of the lot so acquired by the plaintiff at the westerly line of the Boston and Maine Railroad; so that by neither of the conveyances to the plaintiff did it become the owner of the land to the new channel, nor abut upon the channel, except as above stated. After the purchase by the plaintiff of the original tract on July 5, 1890, it erected thereon an extensive and valuable plant for the manufacture of electricity, and has carried on the manufacturing of the same to the present time. Immediately after the execution of the deed of release and quitclaim of the triangular piece of land from the Clinton Wire Cloth Company to the plaintiff, and immediately after the execution of the agreement between them hereinbefore set forth, the plaintiff changed the course of the watercourse as contemplated and

agreed upon by the terms of the agreement, such change being made entirely within the limits of the plaintiff's and the Clinton Wire Cloth Company's lands. This change consisted in diverting the watercourse from its former new channel and carrying it northerly to the plaintiff's land, so that the southerly boundary of the plaintiff's land came to the centre of the watercourse. The distance northerly which the watercourse was carried is about twenty feet in its widest part, where it comes to the plaintiff's land ; thence it was carried on the southerly boundary of the plaintiff's land about twenty-five feet, where it met and intersected and followed the former new channel. From the time of this change to the present the water has ceased to flow in the former new channel and has flowed through this last channel. At the time of the last change in the channel, the plaintiff constructed on its land a steam condensing plant for the purpose of condensing steam in its engine, located in the main building of the plaintiff. This condensing plant consisted of a tank, located on the border of the watercourse, into which the water flowed from the stream. The water is then taken from the tank by suction through a pipe and carried to the engine, where it performs the office of condensing steam, and thence in the form of hot water is carried back through a waste pipe to the stream, entering the stream a few feet below the tank. There is no evidence that this last change in the channel of the watercourse, and the construction of the steam condensing plant, were objected to or assented to by any party claiming rights of flowage, except what may be inferred by their silence. In the fall of 1895, the defendants erected a permanent dam across the watercourse. This dam was erected and now stands a few feet west of Main Street, between that street and the railroad, and on the land conveyed to the defendant Eben S. Fuller by deed from James S. Lawrence, in 1885. The dam is located higher up the stream and about four hundred feet distant from the original dam, and is not upon any part of the mill site or lands conveyed by the original deed of John Low in 1823. This dam creates a pond and head of water between the railroad and Main Street, and has been maintained at the same height from its erection to the present time. The defendants have not built a mill nor made any use of the head of water created by the dam,

but they erected this dam for the purpose of utilizing the stream and their right of flowage claimed under their deed. This dam is no higher, and does not raise a head of water to a higher level above the sea, than the old dam which existed from 1823 to 1876. The old dam held the water back, and created a pond at the same place as the pond created by the new dam of 1895. Prior to the erection of this dam by the defendants, the water ran with a fair current in the channel, as it then existed, past the plaintiff's premises and steam condensing plant, but the erection of the dam has set and forced the water back to and beyond the plaintiff's land and steam condensing plant, so that instead of there being a current at this point of the plaintiff's land, as formerly, the water is held dead and at the same height as in the pond created by the dam. This setting the water back so that it is practically dead water at the plaintiff's land has materially impaired the value and effect of the steam condensing plant, in that the warm water flowing back from the engine to the channel through the waste pipe raises the temperature of the water near and at the intake tank, and, not flowing off readily, flows back into the intake tank and thence is drawn through the pipe into the engine at a higher degree of temperature and polluted to some extent. This dam also sets back the water up and into the waste pipe for a distance of about forty feet from the stream, and to a point in the land included in the plaintiff's deed of original purchase. There is no evidence showing that the defendants, at the time they erected their new dam, had knowledge of the exact construction of the plaintiff's steam condensing system and drainage, and that the erection and maintenance of the dam, at its then and present height, would impair or interfere with the operation of the steam condensing system and drainage. The maintenance of the defendants' dam at its present height will permanently injure the plaintiff's steam condensing system, and impair the drainage system within the limits of the tract of land conveyed to the plaintiff in 1890. The plaintiff has sustained appreciable damages to its property by the erection and maintenance of the dam, but no evidence has been introduced as to the amount of such damages in money. At the time the plaintiff changed the channel of the watercourse and put in its steam condensing plant, it had no knowledge or

notice that the defendants, or Frazer, or any other party, claimed any rights of flowage in the watercourse, except the constructive knowledge and notice implied by the foregoing conveyances, which were duly recorded in the registry of deeds, and such knowledge as may be inferred from the agreement hereinbefore set forth.

Frazer brought suit in 1881 against the Bigelow Carpet Company and the Worcester and Nashua Railroad Company, to recover damages for the destruction of his mill, dam, and water privileges, occasioned by the breaking of the Bigelow Carpet Company's dam on March 26, 1876, and recovered judgment, which was satisfied.

Frazer had knowledge of the building and existence of the plaintiff's gas and electric light plant, but had no knowledge of the use the plaintiff was making of the water for the purpose of operating its steam condensing system and plant until the bringing of the present suit.

Hearing before *Maynard*, J., who found and ruled as follows:

" Upon the facts found by the master, and evidence reported by him, I rule, as matter of law, that by the deeds under which the defendants claim title they acquired a right to maintain their dam at the height found by the master, unless said right had theretofore been waived, released, abandoned, or otherwise lost; that the change in the channel of the brook by the construction of the railroad, or by the washout as found by the master, did not destroy said right; and that the bringing of suit and recovery of damages as found by the master did not destroy said right.

" I find as a fact from the facts found by the master and evidence reported, that said right was never abandoned, waived, or released by the defendants, or those under whom they claim, but still existed at the times of the acts of the defendants."

A decree was entered dismissing the bill, with costs ; and the case was reported for the determination of this court. If the findings and decree, upon the facts found by the master, were warranted and correct in law, the decree was to be affirmed; otherwise, such decree was to be entered as this court should order.

*H. Parker & F. E. Gunnison*, for the plaintiff.

*W. A. Gile & J. Smith*, for the defendants.

MORTON, J.  By the deed from John Low to Henry Low in 1823, the right of flowage as far as the Plant land was annexed to the premises conveyed, and by mesne conveyances passed to the defendants, unless it had been lost, released, or abandoned. Assuming that nothing else had happened to impair the right, the non-user from the time of the washout in 1876 to the time when the defendants built their dam in 1895, did not extinguish it.  *Butterfield* v. *Reed*, 160 Mass. 361.  *Eddy* v. *Chace*, 140 Mass. 471.  *Barnes* v. *Lloyd*, 112 Mass. 224.

But the plaintiff contends that the right was limited to the channel of the stream then existing, and was lost by the change which was made in 1848.  That change was acquiesced in by all parties, and the old channel presumably was closed up, and the new channel continued to be used till the washout in 1876. We should hesitate to say that one using the new channel under such circumstances lost the right of flowage granted by deed, and thenceforward would have to depend on a right by pre-scription.  But we do not think that the right was limited to the existing stream.  We think that the words in the deed from John Low in 1823, " with the privilege of following up the ditch to the bounds of land owned by Samuel Plant," were not intended to limit the right of flowing to the ditch, but to fix the height to which the dam might be maintained and the land of the grantor flowed.  According to this construction, the changes in the channel in 1848 and in 1876 become immaterial.  There is nothing to show that the land flowed by the defendants ex-ceeds the limits thus established, or that they have committed any wrong towards the plaintiff in rebuilding their dam, and flowing to the height originally granted.  If the plaintiff has suffered harm in consequence of what the defendants have done, there is no remedy for it, and it must be presumed that the plaintiff built and has maintained its works with knowledge of the rights of the defendants and their predecessors in title. We discover nothing in the suit brought by the grantor of the defendants, or in its settlement, which operated as a bar to or release of the right to build a dam and to flow to the height granted.

*Decree of the Superior Court affirmed.*